## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

MARCUS D. TORRY, LATRELL Q. GOSS, and WILLIAM I. ROBERTS,

    Plaintiffs,

    v.

CITY OF CHICAGO, et al.,

    Defendants.

Case No. 15-cv-8383

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

This case arises from a 2014 traffic stop that Plaintiffs claim violated their Fourth and Fourteenth Amendment rights. Plaintiffs Marcus Torry, Latrell Goss, and William Roberts sued Defendant Officers and the City of Chicago in September 2015, [1], alleging the following claims: (I) Illegal Stop, under 42 U.S.C. § 1983; (II) False Arrest/Illegal Detention, under § 1983; (III) Assault; (IV) Battery; (V) Illegal Search and Seizure, under § 1983; (VI) Failure to Intervene, under § 1983; (VII) Conspiracy to Interfere with Plaintiffs' Civil Rights, in violation of 42 U.S.C. § 1985; and (VII) Conspiracy to Deprive Plaintiffs of Civil Rights, under § 1983, [23].

The parties cross-filed for summary judgment. [63, 66]. For the reasons explained below, this Court denies Plaintiffs' motion for summary judgment, [66], and partially grants and partially denies Defendants' motion for summary judgment, [63].

# I.    Background

## A.    Local Rule 56.1 and Evidentiary Rules

On September 23, 2014, Officers Jacek Leja and Justin Raether and Sergeant Robert King (Defendant Officers) stopped Plaintiffs' car on the 2900 block of West Polk Street in Chicago.  PSOF ¶¶15–18, 21; DSOF ¶ 10.[1]  The parties dispute many of the circumstances surrounding the stop and this Court notes those disagreements in its discussion of the incident.

The parties' disputes extend to almost the entirety of each other's statements of fact.  *See generally* R. DSOF; R. PSOF.  This Court has broad discretion to enforce the local rules governing summary judgment motions.  *See, e.g.*, *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014).  As such, simply denying a fact that has evidentiary support "does not transform it into a disputed issue of fact sufficient to survive a motion for summary judgment," and this Court disregards any insufficient denials.  *Roberts v. Advocate Health Care*, 119 F. Supp. 3d 852, 854 (N.D. Ill. 2015) (citation omitted); *see also Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000). Likewise, "purely argumentative denials," legal conclusions, and unsupported general denials do not belong in Local Rule 56.1 statements, and this Court disregards them as well.  *See, e.g.*, R. DSOF ¶ 14; *see also Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012); *Malec*, 191 F.R.D.

---

[1] The facts come from the parties' Local Rule 56.1 statements.  DSOF refers to Defendants' statement of undisputed facts [65], with Plaintiffs' responses [83] cited as R. DSOF.  PSOF refers to Plaintiffs' statement of undisputed facts [67], with Defendants' responses [82] cited as R. PSOF. PSAF refers to Plaintiffs' statement of additional undisputed facts [84], with Defendants' responses [92] cited as R. PSAF.  DSAF refers to Defendants' statement of additional undisputed facts [81], with Plaintiffs' responses [97] cited as R. DSAF.  References to additional filings use docket numbers.

at 584; *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000) (applying Rule 56 under its prior designation as Rule 12). Finally, this Court finds no merit in either parties' claims that their opponents' statements of fact are irrelevant, *see e.g.*, R. DSOF ¶ 11, R. PSOF ¶ 30, because the facts bear directly on the outcome of this case, *see* Fed. R. Evid. 401.

This Court further finds the videos of the stop recorded by Torry and Goss, as well as the statements within Torry's video, constitute admissible evidence for purposes of summary judgment. *See* [60-7]; [60-8]. Although Torry and Goss recorded the videos and submitted them as joint exhibits with Defendants, Plaintiffs now appear to challenge the video evidence on the grounds of authenticity and completeness. *See, e.g.*, R. DSOF ¶ 20. But the parties already agreed to the tapes' authenticity in their statements of fact, and thus undermine any challenges to the admissibility of the videos at this stage. *See* R. PSOF ¶¶ 9, 10; Fed. R. Evid. 901(a); *Smith v. City of Chicago*, 242 F.3d 737, 741–42 (7th Cir. 2001).

As to completeness, Plaintiffs contend that "there is no video of the entire incident, and no video of the incident before plaintiffs were pulled over by defendants." R. DSOF ¶ 20. Without citation to any relevant portions of the record, this insufficient factual denial, *see Malec*, 191 F.R.D. at 584, fails to show that any portion of the video has been withheld, or explain how in fairness some other evidence ought to be considered at the same time as the video evidence. Thus, this Court has nothing further to consider under Federal Rule of Evidence 106, and Plaintiffs fail to make a proper showing under the completeness doctrine or

otherwise call the video's accuracy into question. *See United States v. Cejas*, 761 F.3d 717, 724–25 (7th Cir. 2014) (affirming admissibility of video absent any "sound reason to doubt the video's authenticity").

As to the statements audible on Torry's video, [60-7], Plaintiffs offer a general objection to all such statements as inadmissible hearsay, R. DSOF ¶ 20; [88] at 4. Where Defendants offer Plaintiffs' statements as evidence, and vice versa, those statements are admissible as statements of a party-opponent. *See* Fed. R. Evid. 801(d)(2). Where Defendants offer their own statements, those made in the context of King's heated discussions with Torry are admissible on multiple grounds, including as present sense impressions or excited utterances. *See id*. 803(1) and (2).

Finally, this Court finds that any remaining statements not covered by these provisions meet the requirements for admissibility under the completeness doctrine, or remain admissible for non-hearsay purposes. *See id*. 106; *United States v. Haddad*, 10 F.3d 1252, 1258–1259 (7th Cir. 1993). Torry's video is just over 13 minutes long; it depicts the entirety of the stop after King approached Plaintiffs' car. *See generally* [60-7]. Plaintiffs challenge the legality of the stop from start to finish. *See generally* [68]; [88]. Since determining the reasonableness of an investigatory stop requires a context-dependent inquiry, in which courts assess the justification for, duration, and manner of the stop "in light of the surrounding circumstances," *see Matz v. Klotka*, 769 F.3d 517, 523–25 (7th Cir. 2014), this Court finds that admitting any additional statements in the video: (1) explains the previously admitted statements; (2) contextualizes them; (3) avoids misleading the

trier of fact; and (4) ensures "a fair and impartial understanding of all the evidence," *see United States v. Doxy*, 225 F. App'x 400, 402–03 (7th Cir. 2007) (citing *United States v. Velasco*, 953 F.2d 1467, 1475 (7th Cir. 1992)).

This Court also rejects Plaintiffs' assertion that Defendants cannot create a genuine issue of material fact because they no longer independently recall the stop. *See, e.g.*, [88] at 4. This argument ignores the documentary and video evidence related to the circumstances of the stop, as well as Defendants' deposition testimony about their general recollections of their tasks, duties, and knowledge at the time of the stop. *See, e.g.*, [60-4]; [61-2]; [65-1]. Absent any meaningful and specific objection to the exhibits, this Court may properly consider such admissible evidence at summary judgment. *See, e.g., Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).

Finally, this Court may take judicial notice of Defendants' Google Maps print-out, [65-1] at 13, which shows distances and locations of events relevant to the stop, *see Cloe v. City of Indianapolis*, 712 F.3d 1171, 177 n.3 (7th Cir. 2013), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 864 F.3d 760 (7th Cir. 2016). Absent any showing calling this exhibit's accuracy into question—which Plaintiffs do not offer, *see, e.g.*, R. DSOF ¶ 14—this Court may properly consider such evidence at summary judgment, *see* Fed. R. Evid. 201(d).

## B. The Stop

On the day of the stop, Torry resided at 2442 West Polk Street. [60-1] at 4. While at home with Roberts, Torry received a call from Goss—Torry's brother—

whose car had broken down near the intersection of West Polk and South California Avenue. *Id.* at 6; PSOF ¶ 14. Around noon, Roberts and Torry picked up Goss, with Torry driving his mother's gray Ford Fusion. PSOF ¶¶ 14–15. Plaintiffs then drove west along West Polk to South Kedzie Avenue, where they turned south to take Goss to an auto parts store on West Roosevelt Road. *Id.* ¶¶ 16–17. After Goss bought the part he needed, Plaintiffs retraced their route to Goss' disabled car, ending up eastbound on West Polk toward South California. *See id.* ¶¶ 14, 18; [60-1] at 6–7.

Manley High School is located at 2935 West Polk, in the stretch between South California and South Kedzie. *See* DSOF ¶ 14; [65-1] at 13. Plaintiffs' car therefore approached Manley for at least the second time that day as they drove to Goss' car, around 12:48 p.m. *See* PSOF ¶ 18; DSOF ¶¶ 16, 17. It was at this point that they were stopped, on the same block as the school. *See* PSOF ¶¶ 18–22; DSOF ¶¶ 10, 20.

On the day of the stop, King was working as a "school sergeant," meaning that he responded to and investigated violence near schools within his beat, including by patrolling the area around the schools. DSOF ¶¶ 18–19; [60-4] at 7–8. Around the time of the stop, King stood outside the school and saw Plaintiffs' car pass in front of Manley on West Polk for at least the second time "within a short timeframe." DSOF ¶ 20. King claims that he initiated the stop alone at approximately 1:00 p.m. *Id.*; PSOF ¶ 22. Plaintiffs' versions of events differ, *compare* [60-1] at 11 *with* [60-2] at 8 *and* [60-3] at 5, but Goss claims that at least

one other officer participated in the initial stop, [60-2] at 8, and Roberts describes all three Defendant Officers as standing on the sidewalk together before jumping in their cars to jointly effect the stop, [60-3] at 12. Goss' cell phone video shows a marked police car pulling up to Plaintiffs' car after King had already approached Torry's window to ask for identification, but the angle does not capture any officers getting in or out of the vehicle. *See generally* [60-8].

According to King, he stopped Plaintiffs' car because he had reasonable suspicion that Plaintiffs might engage in violence related to either an earlier shooting nearby or ongoing violence in the area, some of which was gang-related. *See* DSOF ¶¶ 21–26; [60-4] at 20; PSOF ¶¶ 25, 28. King bases his account upon Torry and Goss' videos of the stop, King's knowledge and experience relating to the beat he worked at the time, the practices of the police department, police records from the day of the stop, his duties and tasks as a school sergeant, and his familiarity with gang and other violence in the vicinity of Manley. *See* [65-1] at 18–20; [81-1] at 2–4. King no longer independently recalls the stop. [60-4] at 15, 20.

Drawing upon these sources, however, King states that driving back and forth in front of a single location in a high-crime area constitutes targeting behavior, suggesting that the driver may be casing a target for future violence. DSOF ¶¶ 21, 24. Defendants testified that the area around Manley had experienced an increase in aggravated batteries involving weapons and threats to police officers around the time of the stop, DSOF ¶¶ 21–22, and that on the day of

the stop Manley lay within the geographical "box" set up to concentrate further police investigation related to a nearby shooting earlier that day, DSAF ¶¶ 11, 16.

Defendants also contend that Plaintiffs generally matched a description of the suspects involved in that earlier shooting, described as three black males driving a gray vehicle. DSAF ¶ 1. Plaintiffs concede that the race, gender, and number of individuals in Plaintiffs' gray car matched this general information. *See* PSOF ¶¶ 15, 18, 30. According to Defendants, King responded to the shooting that morning and would have received the description of the suspects either when he responded to the scene of the shooting, or via the Office of Emergency Management Communications (OEMC). DSAF ¶¶ 2–8; [81-1] ¶¶ 7, 10, 12. No evidence in the record suggests that any unrelated, additional conduct, such as a traffic violation, prompted the stop. *See* R. PSOF ¶ 23.

The record confirms that a shooting did, in fact, occur on the morning of the stop, at or near 640 South Washtenaw Avenue, about a half mile from Manley. DSOF ¶¶ 11, 13; [65-1] at 3. Police records show that King responded to that incident, and King also notes that OEMC would have disseminated details related to the shooting. *See* [81-1] ¶¶ 2, 7, 8, 10, 11; *id.* at 7. A police report dated October 2014—over a week after the stop—describes the shooting suspects' car as a "Grey Nissan SUV." [65-1] at 7, 9. An earlier report contains no such description. *See id.* at 2–3. The OEMC Event Query Report setting out the chronology of the police response to the shooting contains various explanatory "remarks" from the day of the shooting. *See* [81-1] at 6–10. Those remarks confirm that the police identified the

suspects as three black males in a gray vehicle, but offer conflicting descriptions of the exact make or model of the suspects' car. A remark time-stamped 8:51 a.m. describes it as a "newer model gry Nissan." *Id.* at 7. Another remark that appears to be time-stamped 8:43 a.m. reports a witness saw a "gray Trailblazer," *id.* at 9, while a final remark lacking any time stamp states that the suspects' car was a "newer gry Nissan SUV," *id.* at 10.

King testified that, at the time of Plaintiffs' stop, the available information indicated that the shooting suspects drove a gray vehicle, without the details of its make or model. *See* [60-4] at 20; [81-1] ¶ 14. King states that he "was still actively investigating the shooting incident" at the time of Plaintiffs' stop and "would have been on the lookout for a grey vehicle with three African American male occupants." [81-1] ¶¶ 13, 14; *see also* DSOF ¶¶ 20–22. Defendants also contend that these circumstances combined with Plaintiffs' repeated passes in front of Manley suggested that Plaintiffs "were about to be involved in retaliatory actions." DSOF ¶ 21. Plaintiffs argue, on the other hand, that the records of the earlier incident sufficiently distinguish Torry's car—a gray sedan—from the suspects' car, identified as a gray SUV. [88] at 6, 7.

Once Plaintiffs pulled over, King approached their car and asked Torry for his license and registration. *See* PSOF ¶ 32; DSOF ¶ 27; [60-7], at 00:01. Upon King's approach, Torry began video-recording the encounter on his cell phone. *See* PSOF ¶ 9; *see generally* [60-7]. Torry's video runs the full length of the stop, until he drives off in his car upon his release. *See generally* [60-7]. Goss also made a

recording, though it lasts only about a minute. *See generally* [60-8]. At this point, even though the parties continue to dispute the details of the encounter, this Court assesses their accounts in light of the video evidence. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (holding that courts need not accept accounts "blatantly contradicted by the record," but should view "the facts in the light depicted" by video evidence); *see also Hurt v. Wise*, -- F.3d --, 2018 WL 507595, at *6 (7th Cir. Jan. 23, 2018) (explaining that *Scott* requires courts to discredit accounts that "flatly" contradict video evidence, but preserves the rule that courts draw inferences from the depicted events in the light most favorable to the opposing party).

## C.    The Video Footage

Torry's video begins with King's request for identification, followed by Torry asking why he was detained. [60-7] at 0:00–0:10. King replies that "this was about your third pass by this school." *Id*. at 0:10. King then clarifies that he is conducting a *Terry* stop, or "a custodial stop," because Torry "cruised this street here around this school," adding that the area was "a safe passage" and "the immediate location of a shooting this morning." *Id*. at 0:56–2:00. Over the course of the stop, King repeatedly emphasizes that he stopped Torry because he saw Torry drive past the school—Manley—three times. *See id*. at 2:45, 4:02.

After Torry hands King his license and registration, King and Torry have a disagreement: Torry denies that he passed the school three times, King tells him not to argue, and Torry demands King's badge number. *Id*. at 0:10. King then appears to step away from Plaintiffs' car for a moment. *Id*. at 0:40–0:56. He

returns and tells Torry, "Step out of the car," already reaching for the handle of the driver's door. *Id*. at 0:56. Torry asks if he's under arrest, to which King responds: "Sir, get out of the car please. Sir, this is a *Terry* stop, I have the right to search the car, get out of the car." *Id*. at 1:00. By now, a second officer stands with King outside the driver-side door. *Id*. at 1:07. King continues: "If you don't get out of the car, I will remove you from the car." *Id*. Torry responds, "I'm gonna remove myself but I just don't want to get—y'all get me, shoot me, or kill me for something I didn't do wrong." *Id*. at 1:14. King mocks Torry's concern, saying: "Yes, sir, absolutely; hands up, don't shoot, there you go." *Id*. at 1:16.

Torry testified that at this point he took off his seatbelt and got out of the car, but that King took his arm anyway as he exited: "He just grabs me out of the car." [60-1] at 9. King then placed Torry in the back seat of his car. *Id*. Goss testified that one officer "grabbed" Torry out of the car, while another "grabbed" Goss out. [60-2] at 10. The video does not capture the parties' movements at this point, but King audibly says, "Come on out, sir, let's go back to my car, sir, right over here," while Torry repeats, "Please don't shoot." *Id*. at 1:20–1:27.

Plaintiffs' account indicates that at about this point—after Plaintiffs had been ordered out of the car—Leja prepared a can of mace by shaking it. *See* PSOF ¶¶ 34–40. Defendants offer unrebutted evidence that Leja shook the can only after Torry "failed to comply with at least 4 different commands to exit the vehicle." DSAF ¶ 19; *see also* R. DSAF ¶ 19; [60-7] at 0:56–1:14 (multiple orders to exit the

car).  In any event, Plaintiffs ultimately exited the car and Defendant Officers never used mace.  *See* PSOF ¶¶ 34, 38; R. DSOF ¶ 30.

Having placed Torry in the back of his car, King remains in the front seat for a few minutes, ostensibly running the name and warrant checks that the parties agree took place while Defendant Officers detained Plaintiffs.  *See* [60-7] at 1:30–4:29; PSOF ¶¶ 64, 69; DSOF ¶ 34.  King then returns to the other parties, standing near Torry's car, leaving Torry alone in the police car.  *See* [60-7] at 6:13–9:47.  On the video, Torry narrates that Defendant Officers are asking Goss and Roberts for their information; and at one point, Goss approaches Torry telling him through the window to be quiet, with Torry responding, "Leave me alone!"  *See id*. at 7:00–8:10.

Goss and Roberts assert that, while Torry was in King's car, Raether and Leja patted them down and searched Goss' pockets.  *See* PSOF ¶ 65; [60-2] at 16.  Neither Torry nor Goss' cell phone videos capture this interaction, and Leja and Raether do not now recall if they searched Goss' pockets.  DSAF ¶ 26.  Defendants contend, however, that any search of Goss' pockets was consensual, prior to them giving Goss a lift back to his car, as discussed below.  *Id*. ¶ 27.

Plaintiffs also appear to claim that one of the Defendant Officers searched Torry's vehicle, *see* [68] at 10; [88] at 9, although in their statement of facts they state only that an officer "looked into the car," PSOF ¶ 70.  In his deposition, Torry stated twice that he saw an officer in his car searching it, though he contradicted himself on this point.  *See* [60-1] at 12–13.  Goss testified that the officers "looked in the vehicle," but he did not know if the officers ever entered or rummaged around in

the car. [60-2] at 16. Neither video depicts any vehicle search. *See generally* [60-7]; [60-8].

About nine and a half minutes after King first asked for Torry's identification, and about eight minutes after Torry was placed in King's car, King returns to Torry and leads him back to the Ford Fusion. *See* [60-7] at 09:47. Torry asks King if he is under arrest, and King replies: "If you were under arrest, you'd be in handcuffs." *Id*. at 9:57. Torry gets back in his car and King returns Torry's license and proof of insurance. *Id*. at 10:02–10:18. Shortly after, one of the Defendant Officers hands Torry a document through the window. *Id*. at 10:31. At this point, Torry's video captures part of an exchange between Goss and Defendant Officers. One of the officers says, "You don't want anything to do with him," and, in response to an unintelligible reply, responds, "Yeah, c'mon, jump in the car . . . yeah we'll give you a ride home." *Id*. at 10:40. Torry can then be heard exclaiming, "Fuck off then! You don't side with police." *Id*. Goss testified that the officers told him to get in their car to return to his disabled car. [60-2] at 15.

By the twelve-minute mark, Torry has driven off down West Polk with Roberts. *See* [60-7] at 12:15. He narrates, "I'm still recording cause they behind me," indicating that Defendant Officers were driving behind his car. *Id*. at 12:22; PSOF ¶¶ 76, 77. Goss testified that, while he rode in the squad car with Raether and Leja behind Torry's car, they debated pulling Torry over again "to mess with him." [60-2] at 17. Torry was not stopped a second time. *Id*. Torry's video ends at about thirteen minutes without any further interactions between Plaintiffs and

Defendant Officers.  *See* [60-7].  The OEMC Event Query documenting this stop records that the stop started at approximately 12:58 p.m. and "cleared" at 1:21 p.m., a period of 23 minutes.  *See* [61-6].  King noted in his deposition that recording an incident "cleared" does not indicate the time that an officer releases a detained suspect, but rather when an officer closes out the incident, which might require completing administrative tasks.  *See* R. PSOF ¶ 71.

Plaintiffs sued Defendants in September 2015.  [1].  They amended their complaint in March 2016.  [23].  This opinion addresses the parties' cross-motions for summary judgment on all counts.  [63, 66].

## II.    Legal Standard

A motion for summary judgment can be granted only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party seeking summary judgment has the burden of establishing that no genuine dispute exists as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The motion will be granted only if, viewing the record in the light most favorable to the non-moving party, no jury could reasonably find in the non-moving party's favor.  *McDonald v. Hardy*, 821 F.3d 882, 888 (7th Cir. 2016).  The moving party is entitled to summary judgment where the non-moving party fails to establish an "essential element" of the case with respect to which that party has the burden of proof.  *Celotex Corp.*, 477 U.S. at 323; *see also Johnson v. Cambridge*

*Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) ("As we have said before, summary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.") (quoting *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)) (internal quotation marks omitted).

## III.  Analysis

Certain disputed facts in this case require this Court to deny the parties' motions for summary judgment with respect to a few of Plaintiffs' claims.  *See Anderson*, 477 U.S. at 248.  Specifically, when resolving a claim requires making a credibility determination or weighing evidence, these tasks belong to the factfinder, not to the district judge at summary judgment.  *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  Here, however, Plaintiffs' admissions and other record evidence eliminate various factual disputes, and this Court grants summary judgment where that evidence leaves "no genuine issue for trial."  *A&M Records, Inc. v. A.L.W., Ltd.*, 855 F.2d 368, 372 (7th Cir. 1988).

This Court addresses each of Plaintiffs' claims in turn.  Defendants raise a qualified immunity defense with respect to Counts I, II, and V, and a state tort immunity defense with respect to Counts III and IV.  [64] at 11, 13, 14.  This Court considers these defenses within its discussion of each claim.

### A.  Count I: Illegal Stop

When a police officer has "a reasonable, articulable suspicion that criminal activity is afoot," the Fourth Amendment permits a "brief, investigatory stop." *Illinois v. Wardlow,* 528 U.S. 119, 123 (2000) (discussing *Terry v. Ohio,* 392 U.S. 1

(1968)); *see also United States v. Snow*, 656 F.3d 498, 500 (7th Cir. 2011). Reasonable suspicion means "more than a hunch but less than probable cause and considerably less than preponderance of the evidence," *Snow*, 656 F.3d at 500 (internal quotation marks omitted).

In determining whether reasonable suspicion exists, courts assess the reasonableness of the officer's stop objectively, taking into account the totality of the circumstances. *See United States v. Cortez,* 449 U.S. 411, 417 (1981) (courts must consider the "whole picture"); *United States v. Johnson*, 170 F.3d 708, 714–15 (7th Cir. 1999) (courts consider "the totality of the circumstances" from "the standpoint of an objectively reasonable police officer") (internal quotation marks omitted). Relevant circumstances include "the experience of the officer and the behavior and characteristics of the suspect," *United States v. Bullock*, 632 F.3d 1004, 1012 (7th Cir. 2011), whether the location of the stop is a high-crime area, *Wardlow,* 528 U.S. at 125, as well as "rational inferences" from the facts available to the detaining officer, *Terry*, 392 U.S. at 21; *see also Bullock*, 632 F.3d at 1012. The suspect need not have actually committed or be engaged in illegal activity; reasonable suspicion may be "based on acts capable of innocent explanation." *United States v. Valentine,* 232 F.3d 350, 356 (3d Cir. 2000); *see also United States v. Miranda-Sotolongo*, 827 F.3d 663, 669 (7th Cir. 2016) (officers may consider "suspicious behavior" that also has "an innocent explanation"). The circumstances, however, "must raise a suspicion that the particular individual being stopped is engaged in wrongdoing." *Cortez,* 449 U.S. at 418.

Additionally, an officer's stop is reasonable if it is justified based upon "the collective knowledge of the agency for which he works," even if the officer's firsthand knowledge is insufficient to create reasonable suspicion on its own. *United States v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010); *see also United States v. Ledford,* 218 F.3d 684, 689 (7th Cir. 2000) (holding that if the search or seizure constitutes a "joint endeavor," the trial court may properly consider what other officers knew and impute that collective knowledge to the officer taking action). Ultimately, determining whether "reasonable suspicion exists is not an exact science, and 'must be based on commonsense judgments and inferences about human behavior.'" *Matz*, 769 F.3d at 522 (quoting *Wardlow*, 528 U.S. at 125).

Here, the undisputed facts of the stop at issue include: (1) the area around Manley had seen a recent spike in violence; (2) Plaintiffs were stopped within the geographic "box" within which law enforcement was still investigating a nearby shooting from earlier that morning; (3) King had responded to the shooting and was still actively investigating it; (4) the race, gender, and number of individuals in Plaintiffs' car matched the information about the suspects in the earlier shooting; (5) Plaintiffs' car at least partially matched the description of the suspects' car; (6) Plaintiffs drove past Manley twice;[2] (7) King's experience led him to believe that

---

[2] On Torry's video, King claims that he saw Plaintiffs' car pass Manley three times, [60-7] at 4:02, while Torry claims he drove past only once, *id*. at 2:45. Plaintiffs argue that this Court must credit Torry's statement. [88] at 6. Not so. As discussed above, the record unequivocally establishes that Plaintiffs' car drove down West Polk at least twice before they were stopped. This Court need not credit a statement that is "blatantly contradicted by the record." *See Scott*, 550 U.S. at 380. Moreover, at the motion hearing, Plaintiffs' counsel conceded the fact that Plaintiffs' car drove past the location at least twice.

"repeated passes" in front of a single location demonstrated "gang rival targeting" behavior; and (8) in the context of the earlier shooting that morning, King believed that this behavior suggested imminent retaliatory actions. *See* [65-1] at 20; [81-1] at 6–10; PSOF ¶¶ 15, 18, 30; DSOF ¶¶ 11, 21–24; DSAF ¶¶ 11, 16, 21–22, 24.[3]

Taken together, these facts provide the "minimal level of objective justification" needed to support reasonable suspicion. *Wardlow*, 528 U.S. at 124. Recent shootings and gang activity "can contribute to reasonable suspicion," *United States v. Ford*, 872 F.3d 412, 415 (7th Cir. 2017), as can an officer's informed conclusion that a suspect has engaged in casing behavior, *see Green v. Newport*, 868 F.3d 629, 631, 634 (7th Cir. 2017). In light of the totality of the circumstances here, including the recent violence in the immediate area, the fact that Plaintiffs passed Manley twice and matched the general information about the suspects in the earlier shooting (i.e., the number, gender, and race of individuals driving in a gray vehicle), the law permits the "rational inference," *Terry*, 392 U.S. at 21, that Plaintiffs may have been about to engage in violence. This Court also accords an appropriate amount of deference to King's professional assessment of Plaintiffs' actions at the time of the stop, *see Ornelas v. United States*, 517 U.S. 690, 699 (1996) (noting that a police officer's inferences drawn from the facts and the officer's experience "deserve deference"); *see also Plumhoff v. Rickard*, 134 S.Ct. 2012, 2020–21 (2014) (explaining that courts cannot analyze the totality of circumstances "with the 20/20

---

[3] This Court considers the final listed fact undisputed because Plaintiffs' denial rested upon improper legal conclusions and statements that did not contradict Defendants' statement. *See* R. DSOF ¶ 21. As discussed above, such a denial is insufficient to dispute a fact supported by record evidence. *See Phillips*, 855 F. Supp. 2d at 771; *Malec*, 191 F.R.D. at 584.

vision of hindsight" and instead must allow for the fact that police officers "are often forced to make split-second judgments").

Contrary to Plaintiffs' claims, this stop did not depend upon "suspicion so broad that it would permit the police to stop a substantial portion of the lawfully driving public." *Miranda-Sotolongo*, 827 F.3d at 669. Rather, Plaintiffs' behavior, vehicle, and general description, viewed in context, provided specific, articulable suspicion. *See Wardlow*, 528 U.S. at 124 (sustaining stop where defendant fled police in area known for drug trafficking); *Green*, 868 F.3d at 631 (sustaining vehicle stop where suspect's car circled robbery target multiple times); *United States v. Breland*, 356 F.3d 787, 790–91 (7th Cir. 2004) (sustaining stop where defendant matched general description of suspected drug dealer and was near building known for drug trafficking); *United States v. Tirrell*, 120 F.3d 670, 674–75 (7th Cir. 1997) (sustaining vehicle stop where one of the car's five occupants generally matched description of a bank robber and the car matched a vehicle involved in a different robbery); *United States v. Tilmon*, 19 F.3d 1221, 1225, 1228 (7th Cir. 1994) (sustaining vehicle stop where defendant matched the general description of a bank robber and his vehicle, despite two-hour and 50-mile "gap" between the stop and the robbery).

Given the undisputed portions of the record, Plaintiffs fail to undermine the legality of the stop. Other than Plaintiffs' attempts to discount Defendants' evidence, addressed above, their primary argument for why these circumstances fail to establish reasonable suspicion is that certain police records show the shooting

suspects' car—unlike Plaintiffs'—was an SUV. *See* [68] at 5; [88] at 6. Reliance upon this lone fact, however, is misplaced.

When viewed in context, the police records do not undermine the reasonable suspicion collectively held by King and the police department. *See Williams*, 627 F.3d at 252 (collective knowledge doctrine). The OEMC event query documenting the police response to the shooting indicates that the police department had some conflicting initial information about the exact make and model of the suspects' gray car. *See* [81-1] at 7, 9 ("gry Nissan" and "gray Trailblazer"). A third remark describing the suspects' car as a Nissan SUV, however, lacks a time stamp. *See id.* at 10. Finally, a police report (dated more than a week after the stop occurred) indicates that the suspects' vehicle was a "Grey Nissan SUV," [65-1] at 7–9, but this after-the-fact report sheds no light on what police knew *before* Plaintiffs' stop, which is what matters to the reasonable suspicion determination, s*ee D.Z. v. Buell*, 796 F.3d 749, 754 (7th Cir. 2015) (assessing the reasonableness of an investigatory stop in light of the facts available at the time). This later report has even less probative value because an earlier report from the day after Plaintiffs' stop (and the shooting) lacks the SUV information altogether. *See* [65-1] at 2–3.

In short, Plaintiffs offer no evidence that King or the police department knew, *at the time of the stop*, that the shooting suspects drove an SUV. *See Buell*, 796 F.3d at 754. Nor do they controvert King's statement that he was "on the lookout for a grey vehicle with three African American male occupants." [81-1] ¶ 14; *see also* R. DSAF ¶ 16. And, consistent with the color of the gray car visible on Torry's video,

Plaintiffs admit, as they must, that they matched this description at the time of the stop. *See* PSOF ¶¶ 15, 30; [60-7] at 9:04. Certainly, there is no evidence in the record to establish that, prior to the stop, the police possessed sufficient information to exclude Plaintiffs from the ongoing investigation.

In any event, the law does not require reasonable suspicion to be an "exact science." *Matz*, 769 F.3d at 522 (citing *Wardlow*, 528 U.S. at 125). Accordingly, police officers may stop cars that only generally match descriptions of a suspect vehicle, particularly where other factors bolster their suspicion. *See United States v. Wimbush*, 337 F.3d 947, 950 (7th Cir. 2003) (holding that stop was reasonable where defendant "matched the description of the suspect" and drove a car "substantially similar to the one driven by the suspect" only blocks from the site of a recent shooting). Given the natural inconsistencies often present in reliable eyewitness accounts, the law provides some leeway to police officers and allows them to pursue investigations even when they receive imperfect information in the field. Thus, reasonable suspicion can exist even in the midst of factual discrepancies. *See United States v. Hurst*, 228 F.3d 751, 756 (6th Cir. 2000) (sustaining stop where suspect's car was described as "a Ford Thunderbird containing two persons" and defendant's car was "a Mercury Cougar containing three persons"); *Guidry v. Boyd*, No. 06-c-1600, 2007 WL 2317174, at *7 (N.D. Ill. July 17, 2007) (collecting cases). And even a clear mistake of fact regarding the make or model of the suspects' car would not necessarily vitiate the reasonableness of Defendant Officers' suspicion. *See Snow*, 656 F.3d at 499–500 (inaccurate

description of vehicle by 911 operator supported officer's reasonable suspicion); *United States v. McDonald*, 453 F.3d 958, 962 (7th Cir. 2006) (detaining officer's reasonable mistake of fact can support reasonable suspicion).

Lastly, even if the circumstances here fell short of reasonable suspicion (which they do not), Plaintiffs fail to overcome Defendant Officers' qualified immunity defense. The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The protection of qualified immunity, therefore, applies regardless of whether the officer's error is a mistake of law, a mistake of fact, or a mistake based upon mixed questions of law and fact. *Id.*

Once Defendants invoked qualified immunity, the burden shifted to Plaintiffs to show: "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (internal quotation marks omitted). If this Court answers either inquiry "in the negative, the defendant official is entitled to summary judgment." *Green*, 868 F.3d at 633. These inquiries need not be answered in order. *Pearson*, 555 U.S. at 236. Here, Plaintiffs cannot show that Defendant Officers violated a "clearly established" right under the requisite qualified immunity analysis.

To demonstrate that a right was "clearly established" at the time of the alleged violation, Plaintiffs must identify "existing precedent" placing "the statutory or constitutional question beyond debate." *Green*, 868 F.3d at 633 (internal quotation marks omitted).[4] Moreover, the relevant law supporting the clearly established right cannot be "defined at a high level of generality," but must be "particularized to the facts of the case." *Id.* (internal quotation marks omitted). As the Supreme Court puts it, the term "clearly established" means that, at the time of the officer's conduct, the law must be "sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Colombia v. Wesby*, 138 S.Ct. 577, 589 (2018) (internal quotation marks omitted). Such specificity is "especially important in the Fourth Amendment context," where the Supreme Court has recognized that it is sometimes difficult for an officer to determine how the "relevant legal doctrine" will apply to the "factual situation the officer confronts." *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)); *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

Here, the only case Plaintiffs identify as "clearly established law" that Defendant Officers violated is *Phelan v. Vill. of Lyons*, 531 F.3d 484, 489–90 (7th Cir. 2008). *See* [88] at 11. *Phelan* involved an officer who failed to read the full

---

[4] Given the record here, it should go without saying that the facts fail to constitute the "rare obvious case" where a body of relevant case law is not needed. *District of Colombia v. Wesby*, 138 S.Ct. 577, 590–91 (2018) (citing *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)).

description of a suspect's car in a Law Enforcement Agencies Data System (LEADS) report. *See* 531 F.3d at 488. But that case addressed the probable cause standard, not reasonable suspicion, and so it does not apply. *Id.* Besides, Plaintiffs also fail to explain how the relevant facts in *Phelan* otherwise relate to the specific circumstances of the stop at issue here. *See* [88] at 11. Such "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues)." *Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) (internal quotation marks omitted).

In broad strokes, Plaintiffs simply assert that they have a clearly established right not to be stopped absent suspicion. *See* [88] at 11. This argument defines the law much too generally to overcome a qualified immunity defense, and fails to properly address the particular circumstances of this case. *See Green*, 868 F.3d at 633. In fact, the Seventh Circuit recently sustained a grant of qualified immunity on similar facts, finding no precedent barred an investigative stop where the subjects drove near an auto parts store multiple times in a manner that the officer interpreted as "casing" behavior. *See id.* at 634. There, as here, the constitutionality of the officer's conduct was not "beyond debate," *id.*, and thus, Defendant Officers merit qualified immunity on Count I.

### B.     Count II: False Arrest/Illegal Detention

When a traffic stop "extends beyond the time reasonably necessary to complete the purpose for which the stop was made," it might convert "into a full-blown arrest." *Huff v. Reichert*, 744 F.3d 999, 1005 (7th Cir. 2014). Whether or not

a stop rises to the level of custodial arrest, the touchstone for its constitutionality remains reasonableness: "Stops too intrusive to be justified by suspicion under *Terry*, but short of custodial arrest, are reasonable when the degree of suspicion is adequate in light of the degree and duration of restraint." *United States v. Chaidez*, 919 F.2d 1193, 1198 (1990). The reasonableness of any detention thus depends in key part upon "the degree of intrusion," with the necessary level of suspicion increasing as the stop becomes more intrusive. *Id.* at 1197–98. A detention must be "reasonably related in scope and duration to the circumstances that justified the stop in the first instance so that it is a minimal intrusion on the individual's Fourth Amendment interests." *Bullock*, 632 F.3d at 1015. Accordingly, there is no "rigid time limit" for a stop, but in assessing its reasonableness courts should consider "the law enforcement purposes to be served by the stop, the time reasonably needed to effectuate those purposes, and whether the police diligently pursued their investigation." *Id.* (citing *United States v. Sharpe*, 470 U.S. 675, 685–87 (1985)).

Based upon the record, the minimal intrusion on Plaintiffs' Fourth Amendment interests was not unconstitutional. Plaintiffs were detained for under thirteen minutes in a public space and then immediately released. *See* [60-7]. For approximately eight of those minutes, Torry sat in King's car but was never handcuffed. *See id.* Officers patted down Goss and Roberts and may have searched Goss' pockets; Plaintiffs also claim that an officer searched their car. *See* PSOF ¶¶ 65, 70. Whether those alleged searches were permissible is discussed below, but, as to the detention itself, no evidence suggests that Defendant Officers failed to

diligently pursue their investigation to dispel their suspicions that Plaintiffs might be involved in violent activity. *See Sharpe*, 470 U.S. at 686; *see also* [60-7]; PSOF ¶¶ 32, 64, 68, 69; DSOF ¶¶ 34, 41, 45, 46. Indeed, the parties agree that Defendant Officers quickly performed name and warrant checks on Plaintiffs, *see* PSOF ¶¶ 64, 68; DSOF ¶ 34, and Torry's video also shows Defendant Officers actively interviewing Goss and Roberts, *see* [60-7] at 7:51–8:00, 9:03–9:21.

Under well-established precedent, the level of suspicion required to justify such a brief detention is correspondingly minor. *See Bullock*, 632 F.3d at 1015; *Chaidez*, 919 F.2d at 1197–98. In light of the totality of the circumstances noted above, including the fact that Plaintiffs matched information about a recent shooting that King was still investigating, Defendant Officers' decision to run name and warrant checks and talk to Goss and Roberts constituted reasonable means "likely to confirm or dispel" their suspicions. *United States v. Adamson*, 441 F.3d 513, 521 (7th Cir. 2006). Taking thirteen minutes to do so is not obviously unreasonable, and Plaintiffs identify no authority suggesting that it is. *See* [88] at 6–7. This Court also takes into account Torry's confrontational exchanges with King, which ostensibly delayed the short investigation to a minor extent. *See* [60-7] at 0:10–1:20, 1:58–4:02; *see also Adamson*, 441 F.3d at 521 (sustaining 25-minute investigative detention based in part upon suspects' failure to cooperate). The length of detention is a "critical factor" in evaluating the intrusiveness of a stop, *United States v. Robinson*, 30 F.3d 774, 784 (7th Cir. 1994) (citing *Sharpe*, 470 U.S. at 685–86), and here, the evidence weighs in Defendants' favor.

Additionally, the circumstances support the officers' decision to place Torry in the squad car, given that they were investigating a violent offense in a high-crime area, and in light of Torry's combative demeanor and initial failure to follow instructions. *See* [60-7] at 0:10–1:00; *Whitehead v. Bond*, 680 F.3d 919, 932 (7th Cir. 2012) (noting that a stop's location in a high-crime area is relevant to the detention, particularly where there is a connection between the crime rate and the facts supporting suspicion); *Bullock*, 632 F.3d at 1016 (holding that officers' decision to handcuff defendant and place him in the squad car was reasonable where they were investigating crimes "associated with dangerous and violent behavior"); *Jewett v. Anders*, 521 F.3d 818, 824–25 (7th Cir. 2008) (noting that "an investigatory stop can involve a measured use of force" and relevant circumstances include "the defendant's own actions in resisting an officer's efforts") (internal quotation marks omitted).

In any event, this unlawful detention claim also falls to qualified immunity. Again, once Defendants invoked qualified immunity, it became Plaintiffs' burden to show that Defendants violated a clearly established right. *See al-Kidd*, 563 U.S. at 735. Like before, Plaintiffs fail to identify "existing precedent" placing "the statutory or constitutional question beyond debate." *Green*, 868 F.3d at 633 (internal quotation marks omitted). As explained above, Plaintiffs offer up only *Phelan*, 531 F.3d at 489–90, which does not address the reasonable suspicion standard of a *Terry* stop, and when Plaintiffs cite only a generalized right to be "free of a traffic stop" absent particularized suspicion, *see* [88] at 10–11, they define the

relevant law at an impermissibly "high level of generality," *Green*, 868 F.3d at 633 (internal quotation marks omitted). As such, Plaintiffs fail to satisfy their burden. *See id.*

Moreover, existing precedent supports investigative stops under sufficiently similar circumstances such that the legality of Defendant Officers' conduct is clearly not "beyond debate." *Id.*; *see also Sharpe*, 470 U.S. at 688 (sustaining 20-minute detention "when the police have acted diligently" and suspect's actions contributed to delay); *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013) (sustaining 90-minute detention where officers diligently pursued their investigation); *Jewett*, 521 F.3d at 825–26 (sustaining 30-to-40-minute detention based upon officer's mistaken identification of defendant as a murder suspect and defendant's flight); *United States v. Muriel*, 418 F.3d 720, 725–26 (7th Cir. 2005) (13-minute traffic stop was reasonable where officers ran license and warrant checks while asking defendant questions); *Robinson*, 30 F.3d at 783–84 (sustaining 20-minute detention to question suspects who matched description of drug dealers); *Pliska v. City of Stevens Point*, 823 F.2d 1168, 1178 (7th Cir. 1987) (sustaining 10-minute detention in squad car to determine suspect's identity and dispel officer's suspicion that he was planning a burglary).

In light of the above, Defendant Officers are entitled to qualified immunity on Count II.

## C.     Count III: Assault

In Illinois, a person commits assault when they engage "in unlawful conduct which places another in reasonable apprehension of receiving a battery." *Van Horne v. Muller*, 705 N.E.2d 898, 904 (Ill. 1998); *see also* 720 ILCS 5/12-1(a).  A plaintiff alleging assault must show "(1) a threatening *gesture*, or an otherwise innocent gesture made threatening by the accompanying words, that (2) creates a reasonable apprehension of an *imminent* battery." *Kijonka v. Seitzinger*, 363 F.3d 645, 647 (7th Cir. 2004) (applying Illinois law).  Here, Plaintiffs claim that King committed assault when he mockingly said "hands up, don't shoot," while taking Torry out of the car, and that Leja committed assault when he shook a can of mace shortly thereafter.  *See* [68] at 12.

With respect to King's actions, this Court understands that a mocking reference to protests against officer-involved shootings could reasonably unsettle Plaintiffs within the context of this traffic stop.  Long-settled law, however, requires that words be accompanied by a threatening gesture to constitute assault; at a minimum, Plaintiffs must show the rare circumstance showing "that the threat was quite likely to be carried out—immediately." *Kijonka*, 363 F.3d at 647.  Here, even if one were to take King's words as threatening in some manner, no evidence indicates that King made any threatening gesture indicative of *immediate* violence. The imminence element of assault cannot be waived.  *See id*.

Obviously, Leja's preparation of the mace falls closer to the line; however, assault only encompasses "unlawful conduct."  *Van Horne*, 705 N.E.2d at 904.

Plaintiffs' account indicates that Leja prepared the mace after Defendant Officers ordered Plaintiffs out of the car. *See* PSOF ¶¶ 34–40. In fact, Defendants offer unrebutted evidence that Leja shook the can only after Torry "failed to comply with at least 4 different commands to exit the vehicle." DSAF ¶ 19; *see also* R. DSAF ¶ 19. Consequently, Leja reasonably prepared his mace in the event that Plaintiffs physically resisted King's directions, which would constitute obstruction of a peace officer under Illinois law. *See People v. McCoy*, 881 N.E.2d 621, 631 (Ill. App. Ct. 2008) (refusing to exit car and needing to be physically removed from the vehicle constitutes obstruction). At that point, Defendant Officers would have possessed probable cause to arrest Plaintiffs, and the authority to use the force reasonably necessary to effect an arrest or prevent escape. *See Moore v. Chi. Police Bd.*, 355 N.E.2d 745, 749 (Ill. App. Ct. 1976). In this case, Torry's resistance to Defendant Officers' instruction gave Leja reasonable grounds to think that some force might be necessary. *See People v. Jones*, 35 N.E. 3d 970, 975 (Ill. App. Ct. 2015) (sustaining officer's use of force to arrest defendant where defendant "was belligerent and combative from the beginning of the encounter" and failed to cooperate).

Ultimately, however, Torry exited the car voluntarily and Leja never needed to use the mace. *See* PSOF ¶¶ 34, 38; R. DSOF ¶ 30. Preparing for an eventuality in which force *would* have been justified, and ultimately *not* using force when that eventuality failed to materialize, does not constitute "unlawful conduct." *Cf*. 720 ILCS 5/12-1(a). Nor do Plaintiffs offer any authority suggesting that it does. *See* [68] at 12.

Accordingly, neither King's nor Leja's actions meet the statutory definition of assault in Illinois. Nor is the City of Chicago liable on this claim since its employees are not liable. *See* 745 ILCS 10/2-109. This Court grants summary judgment to Defendants on Count III.

### D. Count IV: Battery

In Illinois, a claim for battery requires: (1) the intent to cause harmful or offensive contact with the person of another; which (2) results in harmful contact. *See, e.g.*, *Cohen v. Smith*, 648 N.E.2d 329, 332 (Ill. App. Ct. 1995). Battery also encompasses "nonharmful" but offensive contact that "offends a reasonable sense of personal dignity." *Id*.

Here, Plaintiffs' battery claim includes the allegedly unjustified detention of Torry and Goss, and the patdowns of Roberts and Goss. *See* [68] at 11. Plaintiffs' brief refers only to the fact of Torry and Goss' detention rather than any physical contact, *see id.*, but construing the record in the light most favorable to Plaintiffs, this Court credits Torry and Goss' statements that Defendant Officers touched them while they exited or were removed from their car, *see* [60-1] at 9; [60-2] at 10.

Illinois law permits such contact if it is legally justified. *See Holder v. Ivanjack*, 93 F. Supp. 2d 933, 940 (N.D. Ill. 2000) (applying Illinois law); 720 ILCS 5/12-3 ("A person commits battery if he intentionally or knowingly without legal justification and by any means, (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual."). As discussed above, Defendant Officers had sufficient suspicion to justify Plaintiffs'

stop, so their conduct was legally justified. But this Court need not rely solely upon this basis, because Defendants also merit state tort immunity on this claim.

745 ILCS 10/2-202 bars liability for public employees engaged in the execution of "any law," unless their actions constitute "willful and wanton conduct." "Willful and wanton conduct" requires "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others." 745 ILCS 10/1-210. Section 10/2-202 applies to officers effecting a detention. *See Jones v. Vill. of Villa Park*, 784 F. Supp. 533, 536 (N.D. Ill. 1992) (applying Illinois law).

None of the Defendant Officers' alleged actions rise to the level of "willful and wanton" conduct necessary to pierce state tort immunity. Even if they "grabbed" Torry and Goss out of the car, [60-2] at 10, nothing in Plaintiffs' account shows "an actual or deliberate intention to cause harm," nor do Plaintiffs allege any such injury or intent. *See Smith v. City of Chicago*, 242 F.3d 737, 744 (7th Cir. 2001) (finding that "pulling a suspect from a car, pushing him against the car, and pinning his arms behind his back to handcuff him" was not willful and wanton). And Plaintiffs fail to contend that Defendant Officers were not engaged in the execution of "any law." 745 ILCS 10/2-202. Nor could they, since King, at the very least, was still "actively investigating" the earlier shooting, *see* DSAF ¶ 16, Leja and Raether were assisting him, *see* PSOF ¶¶ 21, 25; DSOF ¶¶ 26–27, and all three officers were on duty and within the geographical "box" set up to investigate the earlier shooting incident, *see* DSAF ¶ 11; DSOF ¶ 25; [60-5] at 8–9.

Defendant Officers are therefore entitled to state tort immunity. Accordingly, the City of Chicago is also not liable on this claim since its employees are not liable. *See* 745 ILCS 10/2-109. This Court grants summary judgment to Defendants on Count IV.

### E.    Count V: Illegal Search and Seizure

Plaintiffs claim that Defendant Officers illegally searched Torry's car, frisked Goss and Roberts, and searched Goss' pockets. *See* [68] at 9–10. Officers may conduct a protective sweep of a car where they have reasonable suspicion that a suspect is dangerous and "may gain immediate control of weapons." *Michigan v. Long*, 463 U.S. 1032, 1049 (1983). Similarly, a lawful patdown requires reasonable suspicion that the suspect is "armed and dangerous." *Green*, 868 F.3d at 635. A follow-up search of a suspect's pockets, however, cannot be justified on the same basis as the initial stop or frisk, unless the frisk reveals an object whose "incriminating character" is "immediately apparent." *Minnesota v. Dickerson*, 508 U.S. 366, 379 (1993); *see also United States v. Brown*, 188 F.3d 860, 865 (7th Cir. 1999). Finally, merely glancing into a car from a "lawful position" does not implicate the Fourth Amendment. *See United States v. Willis*, 37 F.3d 313, 316 (7th Cir. 1992) (citing *Texas v. Brown*, 460 U.S. 730, 739–40 (1983) ("There is no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers.")).

Here, Plaintiffs' own account of the nature and scope of Defendant Officers' alleged vehicle search remains unclear. *See* PSOF ¶ 70; [60-1] at 12–13; [60-2] at 16; [60-7]. Resolving this factual issue would require making credibility determinations and weighing evidence; these tasks, however, belong to the factfinder and not to the district court at summary judgment. *Payne*, 337 F.3d at 770. Nor can this Court grant qualified immunity where such material facts remain in dispute. *See Isby v. Browne*, 856 F.3d 508, 530 (7th Cir. 2017). Given that this Court cannot determine what kind of search occurred, qualified immunity here presents questions of fact rather than law. *See id.* Accordingly, in light of the record, this Court denies summary judgment to both parties with respect to the alleged search of Plaintiffs' car. *See id.*

Similarly, the parties dispute whether any search of Goss' pockets was consensual. *See* PSOF ¶ 65; DSAF ¶ 27. Resolving this issue would also require a credibility determination inappropriate at summary judgment. *Payne*, 337 F.3d at 770. Absent consent, any search of Goss' pockets would appear to be unlawful, given that there is no evidence in the record that the patdowns revealed any object of an incriminating character, *see Dickerson*, 508 U.S. at 379; DSAF ¶ 27; PSOF ¶ 65, or that Plaintiffs were ever arrested, *see* DSOF ¶ 44; *cf. United States v. Whitsett*, 207 F. App'x 723, 725, 727 (7th Cir. 2006) (searching pockets is permissible when search is incident to arrest). Accordingly, this claim turns upon factual questions, including whether Goss consented to any search of his pockets and whether any such search even occurred; these factual questions belong to a

jury. *Payne*, 337 F.3d at 770. Given the present record, this Court also cannot grant qualified immunity, *see Isby*, 856 F.3d at 530, and summary judgment is denied to both parties on the alleged search of Goss' pockets.

By contrast, the record presents sufficient undisputed facts to justify the patdown of Goss and Roberts. Here, the circumstances justifying the initial stop also justify the patdown since they created reasonable suspicion that Plaintiffs were possibly "armed and dangerous." *Green*, 868 F.3d at 635. As discussed above, the location of the stop was a high-crime area; King was still actively investigating an earlier shooting and Plaintiffs were stopped within the geographic "box" set up to concentrate the police investigation; the race, gender, and number of individuals in Plaintiffs' car matched the information about the shooting suspects; Plaintiffs' car partially matched the description of the suspects' car; Plaintiffs drove past Manley twice; and, based upon the context and King's experience, this behavior suggested imminent violence. *See* [65-1] at 20; DSOF ¶¶ 11, 21–24; DSAF ¶¶ 11, 21–22. Such reasonable suspicion that someone "might be involved" in a violent crime justifies a patdown. *See Snow*, 656 F.3d at 501.

In any event, because Defendant Officers invoke qualified immunity, the burden again shifts to Plaintiffs to identify clearly established law violated by Defendants' conduct. *al-Kidd*, 563 U.S. at 735. Plaintiffs once again fail to identify any precedent showing that on these specific facts, "every reasonable official would understand" that Defendant Officers' actions violated Plaintiffs' rights. *Green*, 868 F.3d at 633 (internal quotation marks omitted); *see* [88] at 9–11. In fact, an officer's

observation of casing behavior related to a violent crime supports reasonable suspicion that the suspect is "armed and dangerous," and an officer conducting a patdown under such circumstances merits qualified immunity. *Green*, 868 F.3d at 635. This Court grants summary judgment to Defendants on the alleged patdowns.

## F.     Count VI: Failure to Intervene

An officer is liable for failing to intervene when he has both reason to know that another officer is violating a constitutional right and "a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). That opportunity exists if an officer could and should have cautioned the officer violating the right to stop. *See Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005). A failure to intervene claim generally presents questions of fact appropriate for the jury; and it should not be decided at summary judgment if the underlying constitutional claims remain unresolved. *See id*. But such claims necessarily fail if no constitutional violation occurred. *See id*. Thus, Count VI survives only with respect to the unresolved constitutional claims that remain pending following this ruling.

## G.     Counts VII and VIII: § 1985 and § 1983 Conspiracy Claims

A § 1985 conspiracy claim requires showing that: (1) the defendants conspired; (2) to deprive any person or class of persons the equal protection of the law; and (3) took or caused another to take an act in furtherance of the conspiracy; (4) resulting in the plaintiff's personal injury or deprivation of a civil right. *See Griffin v. Breckenridge*, 403 U.S. 88, 102–03 (1971). Additionally, the plaintiff must

offer "proof of an invidious discriminatory motivation." *Munson v. Friske*, 754 F.2d 683, 694 (7th Cir. 1985).

Plaintiffs' claim for conspiracy under § 1983 requires showing: (1) an express or implied agreement among Defendant Officers to deprive Plaintiffs of their constitutional rights; and (2) "actual deprivations of those rights in the form of overt acts in furtherance of the agreement." *Thurman v. Vill. of Hazel Crest*, 570 F. Supp. 2d 1019, 1029 (N.D. Ill. 2008) (citing *Scherer v. Balkema*, 840 F.2d 437, 441 (7th Cir. 1988)). Conspiracy claims "cannot survive summary judgment based on vague conclusory allegations that include no overt acts reasonably related to promoting the conspiracy." *Id.* (citing *Amundsen v. Chi. Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000)). Nor may Plaintiffs rely on speculative evidence. *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003).

Here, Plaintiffs' claims are based upon the bare facts that Defendant Officers allegedly got in their cars at the same time to conduct the stop; that King's mocking invocation of "hands up, don't shoot" purportedly reveals racial animus; and that the actions Defendant Officers ultimately took "violated plaintiffs' civil rights." *See* [68] at 14–15. On these conclusory allegations, Plaintiffs fail to demonstrate the existence of a conspiracy. *See Thurman*, 570 F. Supp. 2d at 1029 (absent proof of an agreement, the mere fact that officers communicated prior to stop did not bar summary judgment on conspiracy claim). Plaintiffs fail to even allege that any supposed agreement had the purpose of interfering with, or depriving them of, their civil rights, a required element of both claims. *See Griffin*, 403 U.S. at 102–03;

*Thurman*, 570 F. Supp. 2d at 1029. This Court grants summary judgment to Defendants on Counts VII and VIII.

## IV. Conclusion

This Court partially grants and partially denies Defendants' motion for summary judgment, [63], as follows: this Court grants summary judgment to Defendants on Counts I, II, III, IV, VII, and VIII, and on Count V with respect to the alleged patdowns. This Court denies summary judgment on Count V with respect to the alleged vehicle search and the search of Goss' pockets. Count VI (Failure to Intervene) survives only with respect to the surviving allegations in Count V. This Court denies Plaintiffs' motion for summary judgment, [66], in full, as the disputed facts likewise prevent this Court from granting Plaintiffs summary judgment on Counts V or VI, *see Anderson*, 477 U.S. at 247–48.

Dated: February 20, 2018

Entered:

John Robert Blakey
United States District Judge